CA Form 1

# Superior Court of the District of Columbia
CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001 Telephone: 879-1133

Estate of Terrence Brown
*Plaintiff,*

vs.

Civil Action No. 2005- CA - 04499 B

LeVelle, Inc., et al.,
*Defendant.*

### SUMMONS

To the above named Defendant: LeVelle, Inc.

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

Jimmy A. Bell, Esq.
Name of Plaintiff's Attorney

9610 Marlboro Pike
Address
Upper Marlboro MD 20772

(301) 599-7620
Telephone

By _____
Deputy Clerk

Date _____

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

NOTE: SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

CV(6)-456/May 03

IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ESTATE OF TERRENCE BROWN, through its personal representative CHRISTINE BROWN 813 46th Street, NE Washington, D.C. 20019-3602 :<br><br>Plaintiff,<br><br>v.<br><br>LeVelle, Inc., d/b/a COACH & IV RESTAURANT, d/b/a Club U, 2000 14th Street, N.W. Washington, D.C. 20009<br><br>and<br><br>DISTRICT OF COLUMBIA, a municipal corporation, Office of Corporation Counsel 441 4th Street, N.W. Washington, D.C. 20001<br><br>and<br><br>Office of CORPORATION COUNSEL of the Government District of Columbia 441 4th Street, N.W. Washington, D.C. 20001<br><br>and<br><br>Anthony A. WILLIAMS As Mayor of the District of Columbia 1350 Pennsylvania Avenue, NW Washington, DC 20004<br><br>Defendants | Civil Case No.: 2005-CA-004499B<br><br>JURY DEMAND<br><br>Judge Wright Calendar No. 13 Next Event: Initial Conference 9:30 AM September 16, 2005 |

## AMENDED COMPLAINT

COMES NOW, Plaintiff The Estate of Terrence Brown by and through its personal representative Christine Brown and through counsel, Jacqueline Byrd-Tillman, Esquire, of the Law Office of Jacqueline Byrd Tillman, P.C., 9698 Marlboro Pike, Upper Marlboro, Maryland 20772, and respectfully presents this Complaint against the Defendants for survival action and wrongful death.

1

## JURISDICTION AND VENUE

1. The personal representative of The Estate of Terrence Brown is a resident of the District of Columbia, and the Defendants are incorporated in the District of Columbia; therefore, jurisdiction is proper.

2. Venue is proper in the District of Columbia as the actions that caused the wrongful death complained of occurred in the District of Columbia.

## STATEMENT OF FACTS

3. Christine Brown, the mother of the decedent Terrence Brown, brings this action as the personal representative of the Plaintiff Estate of Terrence Brown.

4. The decedent, Terrence Brown, was a caring and loving son and friend and was just 31 years of age at the time of his death.

5. Defendant District of Columbia is and was at all times relevant to this Complaint a municipal corporation with its principal place of business in the District of Columbia.

6. Defendant LeVelle, Inc., is and was at all times relevant to this Complaint a corporation with its principal place of business in the District of Columbia.

7. Defendant LeVelle, Inc., operates a nightclub business ("Club U") located inside the Franklin D. Reeves Center ("Reeves Center") at 14th and U Streets, NW, in the District of Columbia.

8. The Reeves Center is a municipal building owned by Defendant District of Columbia that is monitored and guarded by Defendant District of Columbia's Protective Services officers.

2

9. In the late 1990s, Defendant District of Columbia attempted to evict defendant LeVelle, Inc., from the Reeves Center premises, contending that LeVelle, Inc., violated its lease by staging late-night events without permission. The eviction complaint also cited property damage, trash, fights and urine in the stairwells of the Reeves Center. Defendant LeVelle, Inc., responded by suing Defendant District of Columbia, charging the District with violating the lease by closing the lobby and parking lot areas of the Reeves Center.

10. On March 16, 2003, a gunfight occurred involving patrons of Club U, who had been involved in a verbal confrontation inside the establishment and had been removed by security personnel from the establishment.

11. On June 19, 2003, four female patrons who were removed from Club U were assaulted with broken bottles outside the club, resulting in serious injury.

12. On November 21, 2003, a Metropolitan Police Department Officer was shot and wounded in the hand by a Club U patron who was leaving the scene of an incident directly across from the Reeves Center during which two other club patrons had been wounded.

13. On October 17, 2004, a disorderly Club U patron was removed from the establishment, whereupon he assaulted a Metropolitan Police Department Officer.

14. In November 2004, Chief of Police Charles Ramsey of the Metropolitan Police Department notified Defendant District of Columbia by a letter to Maria Delaney, of the District's Alcoholic Beverage Regulation Administration ("ABRA"), of a history of violent incidents whose focal point was the nightclub operated by Defendant LeVelle, Inc. Chief Ramsey's letter stated that twelve serious crimes

had occurred within a block of Club U in the preceding seventeen months. This total included three robberies involving guns, two robberies using force and violence, three assaults with knives, and four additional assaults with dangerous weapons other than knives (including 2 assaults on police officers). Chief Ramsey's letter noted that all of the events occurred while Club U was open and operating.

15. Chief Ramsey's November 2004 letter also noted that six of the twelve incidents were directly related to, or occurred in front of, Club U. These included the fatal stabbing of a male patron of Club U in September 2004, and the wounding of police officers during incidents in September 2004 and November 2003.

16. Chief Ramsey's letter stated his conclusion that because of the number and severity of the crimes at and around Club U, ABRA should revoke Defendant LeVelle's license to serve alcoholic beverages and operate as a club to best serve the interests of the community and protect the safety of its patrons. Chief Ramsey made this determination based on calls for police service and reports of criminal activity occurring at and around the location of Club U, and on the recommendation of Commander Larry D. McCoy, of the Metropolitan Police Department's Third District.

17. Chief Ramsey explicitly requested that ABRA revoke Club U's license to sell alcoholic beverages.

18. Jeff Coudriet, a spokesman for the ABRA has stated that Chief Ramsey's November 2004 letter was sent to the Attorney General's office, which was to advise the agency as to what violation(s) might have occurred.

4

19. Despite Chief Ramsey's letter citing a lengthy history of violent crime and recommending revocation of Club U's license, Defendant District of Columbia permitted Defendant LeVelle, Inc., to continue its nightclub operations at the Reeves Center.

20. In the early morning hours of February 13, 2005, Terrence Brown was fatally stabbed while a patron at the nightclub operated by Defendant LeVelle, Inc., at the Reeves Center.

21. Terrence Brown's body was found in the atrium of the Reeves Center.

22. A police crime scene investigator found bloodstains on a wall inside Club U, and interviewed a witness who said Terrence Brown was attacked on the Club U dance floor. This witness said Mr. Brown's body was picked up by Club U's bouncers, who dumped the wounded man in the Reeves Center lobby. This witness further said that she had not been frisked by bouncers on entering Club U, despite having set off Club U's metal detector when she walked through it. The police crime scene investigator testified to these facts at an Alcohol Beverage Control Board ("ABCB") hearing on March 4, 2005.

23. ABCB's decision after the March 4, 2005, hearing stated that the operation of Club U at the Reeves Center presented an imminent danger to the health and safety of the public. It stated that Club U's security procedures, particularly the practice of placing combative patrons in the lobby of the Reeves Center or directly outside, were ineffective to prevent violent incidents.

24. ABRA suspended Club U's license to serve alcoholic beverages as a result of the March 2005 ABCB hearing.

25. At an April 13, 2005 hearing before the ABRA Board, Stevland Joppy ("Mr. Joppy") gave sworn testimony that he was employed as a security guard by Defendant LeVelle, Inc., and was working security at Club U on the night of February 12-13, 2005.

26. In his sworn testimony before the ABRA Board, Mr. Joppy stated that his supervisor was Jimmy Parker ("Mr. Parker").

27. In his sworn testimony before the ABRA Board, Mr. Joppy stated that after breaking up a fight inside Club U, he "grabbed [Terrence Brown] from behind, lifted him up, basically on my shoulder and had to carry him out of the club. I went out the club and stood him up by the bank."

28. In his sworn testimony before the ABRA Board, Mr. Joppy stated that "I had [Terrence Brown] on my left shoulder. I grabbed him from behind. I had my right arm under his leg around in his crotch and I had him up on my shoulder."

29. In his sworn testimony before the ABRA Board, Mr. Joppy stated that he did not stop at any point from the time he first picked up Mr. Brown, nor was his attention diverted, until the time he got out of the club.

30. In his sworn testimony before the ABRA Board, Mr. Joppy stated that, right after he put Mr. Brown down in the atrium, "[Terrence Brown] turned around and looked at me and it's like he got stabbed. He grabbed his leg. I seen some blood on his leg and there was some on my shirt."

31. In his sworn testimony before the ABRA Board, Mr. Joppy stated that at no point from the time he picked Mr. Brown up inside Club U until the time he put Mr. Brown down in the atrium did he see anybody stab Mr. Brown.

6

32. In his sworn testimony before the ABRA Board, Mr. Joppy stated that he saw no one strike or hit Mr. Brown outside Club U.

33. In his sworn testimony before the ABRA Board, Mr. Joppy stated that, right after he set Mr. Brown down in the atrium, "[Terrence Brown] looked at me, he was a little like dazed. I was thinking somebody hit him with a nice shot or something and I indicated he was all right. He was standing up. And all he said was he got stabbed and grabbed his leg and I was like I'll get you some help. He was standing. He was fine. I didn't see no stab wound, but when he grabbed his leg, I seen the blood and he said he got stabbed, so I just assumed that's what had happened. I didn't actually see. I had blood on my shirt." Regarding the timing of this, Mr. Joppy testified, under oath, that Mr. Brown mentioned his stabbing right after Mr. Joppy set him down and he turned to face Mr. Joppy, at which time Mr. Brown said he had been stabbed, and Mr. Joppy looked down at his shirt and saw Mr. Brown's blood had stained Mr. Joppy's shirt.

34. In his sworn testimony before the ABRA Board, Mr. Joppy stated that after Club U closed on the morning of February 13, 2005, he expressed his concern to Mr. Parker about the stabbing "I just basically expressed my feelings where if it did happen inside the club, . . . People need to get their things, their stuff together because if they let somebody in there with a knife, when I grab him to carry him out, I could have been stabbed. I basically expressed that to them . . . if you all letting people in here and you're maybe not searching them or nothing, it just shouldn't happen."

7

35. In his sworn testimony before the ABRA Board, Mr. Joppy stated that Mr. Parker saw Mr. Brown's blood on Mr. Joppy's shirt.

36. In his sworn testimony before the ABRA Board, Mr. Joppy stated that Mr. Parker told him to remove his shirt for cleaning. Mr. Joppy removed his shirt on orders from Mr. Parker and put it on the laundry pile for security personnel shirts.

37. In his sworn testimony before the ABRA Board, Mr. Joppy stated that he saw Club U cleaning staff swabbing down the club with a mop and a bucket.

38. On June 29, 2005, the ABRA finally revoked LeVelle, Inc.'s retailer's license to serve alcoholic beverages. In a summary of the ABRA's voluminous Findings of Facts and Law and Order, ABRA Chairman Charles A. Burger stated that the license was revoked, in part, because "testimony revealed that Respondent [LeVelle, Inc.] lost control over the operation of its establishment on Sunday February 13, 2005, and as a result, several incidents occurred, including the homicide of Mr. Brown[.]" Chairman Burger stated that Stevland Joppy's testimony was one of the primary bases for this finding.

39. The June 29, 2005, ABRA decision found that "[t]he establishment is principally owned by Paul Gwynn, Warren Williams, Sr., and Warren Williams, Jr."

40. The June 29, 2005, ABRA decision found that the ABRA, at its April 13, 2005 proceeding, had denied LeVelle, Inc.'s, request to dismiss the Specifications against it based upon a mutual release provision in the December 16, 2004, Settlement Agreement and Mutual Release entered into by LeVelle, Inc., and the District of Columbia. The ABRA found that this settlement agreement, which discharged both parties from any actions, cases, causes of action, etc., arising

8

under or in connection with either of the parties' claims in a civil lawsuit, did not immunize LeVelle, Inc., from the specifications against it because the claims raised in the civil lawsuit were separate and distinct from the charges against LeVelle, Inc., before the ABRA.

41. The June 29, 2005, ABRA decision found that "Commander Larry D. McCoy has been assigned to the Third District since June 1, 2003. Commander McCoy stated that the MPD has had concerns about the Respondent's establishment and that once MPD started seeing a pattern of violent incidents at the establishment, Chief Ramsey drafted two (2) letters to ABRA Director Maria Delaney, dated November 10, 2004 and February 14, 2005, citing several different incidents, which caused Chief Ramsey to request that the Respondent's license be revoked."

42. The June 29, 2005, ABRA decision found that "Commander McCoy noted that Chief Ramsey's requests primarily stemmed from an incident that occurred on November 21, 2003 where an MPD officer was involved in the pursuit of a subject who had just shot two (2) persons leaving the area of 14th Street, N.W., and U Street, N.W. Commander McCoy stated that the vehicle was involved in a collision and the driver of the vehicle, upon exiting the car, shot through the windshield of the police cruiser, striking the MPD officer in the hand as he was talking on the radio. Commander McCoy indicated that shortly after the November 21, 2003 incident, MPD learned that the shooting suspect as well as the two (2) other victims that had been shot that night had been patrons of the Respondent's establishment."

43. The June 29, 2005, ABRA decision found that "Commander McCoy indicated that all of the incidents cited in Chief Ramsey's letters occurred within one thousand feet (1,000 ft.) of the establishment. Commander McCoy stated that MPD Has made a determination that there is a direct connection between the Respondent's establishment and each of the incidents cited in Chief Ramsey's letters. Commander McCoy stated that there are three (3) homicides associated with the Respondent's establishment, one of which occurred inside of the establishment, and that all of the individuals involved in these incidents are patrons of the establishment. Commander McCoy determined that crime increases in the vicinity of the Reeves Center when the Respondent's establishment is open and operating, based upon the following incidents: 1) October 17, 2004, an MPD Sergeant was struck in the mouth when he attempted to arrest a patron who was put out of the Respondent's establishment; 2) November 21, 2003, an MPD officer was shot by an individual who had just shot two (2) people outside of the Respondent's establishment in an alley; and, 3) February 13, 2005, a female patron was knocked down on the dance floor of the Respondent's establishment and at about the same time, another patron was stabbed inside of the Respondent's establishment and later died."

44. Upon information and belief, Terrence Brown was stabbed on the dance floor of Club U.

45. Upon information and belief, Terrence Brown was bodily removed from the premises and placed in the atrium.

10

46. Upon information and belief, security personnel in the employ of Defendant LeVelle, Inc., knew of Terrence Brown's deadly injuries and did nothing to help him.

47. Upon information and belief, special police officers patrolling the interior of the Reeves Center in the employ of Defendant District of Columbia, knew of Terrence Brown's deadly injuries and did nothing to help him.

48. Upon information and belief, security personnel employed by Defendant LeVelle, Inc., and special police officers patrolling the interior of the Reeves Center in the employ of Defendant District of Columbia saw Terrence Brown bleeding, yet left Terrence Brown to bleed to death while struggling for his life in the atrium of the Reeves Center while they, the security personnel and special police officers, attended to other, non-life-threatening matters.

49. Upon information and belief, Defendant LeVelle, Inc., was well aware of the pattern of violent criminal attacks associated with patrons of Club U, yet took no precautions to protect its patrons.

50. Upon information and belief, Defendant District of Columbia was well aware of the pattern of violent criminal attacks associated with persons visiting the Reeves Center, yet took no precautions to protect visitors to the premises.

51. Upon information and belief, Defendant LeVelle, Inc., had control of the Club U premises and permitted a person or persons carrying a deadly weapon or weapons to enter the premises, despite knowledge that Club U patrons had established a pattern of violent criminal attacks, and such person or persons stabbed Terrence

11

Brown, who died in the Reeves Center atrium after Club U security did nothing to help save him, despite knowledge of the grave nature of his injuries.

52. Upon information and belief, Defendant District of Columbia had control of the Reeves Center premises, with special police officers patrolling inside, and permitted a person or persons carrying a deadly weapon or weapons to enter the premises, despite knowledge that Club U patrons had established a pattern of violent criminal attacks, and such person or persons stabbed Terrence Brown, who died in the Reeves Center atrium after D.C. security personnel did nothing to save him, despite having knowledge of the grave nature of his injuries.

## COUNT I: SURVIVAL ACTION (D.C. CODE ANN. § 12-101) AND WRONGFUL DEATH (D.C. CODE ANN. § 16-2701)

53. Plaintiff re-pleads and re-alleges Paragraphs 1 through 52, with the same force and effect as if set forth separately at length herein.

54. Defendants District of Columbia and LeVelle, Inc., are incorporated in the District of Columbia. Defendant District of Columbia owns the premises of the Franklin D. Reeves Center located at 14th and U Streets, NW, in Washington, DC. Defendant LeVelle, Inc., operates the Club U nightclub in the Franklin D. Reeves Center.

55. Because of the known pattern of violent criminal attacks perpetrated by patrons of Club U, which pattern was specifically brought to the District of Columbia's notice by Metropolitan Police Department Chief Charles Ramsey, the death of a Club U patron as the result of a violent criminal attack was reasonably foreseeable.